United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACOB SILVERMAN,<br><br>    Plaintiff,<br><br>    v.<br><br>IVER LIEN, et al.,<br><br>    Defendants. | Case No. 17-03700 BLF (PR)<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br><br>Docket. No. 86 |

Plaintiff, a pretrial detainee, filed a *pro se* civil rights complaint under 42 U.S.C. § 1983, against prison officials at the Humboldt County Correctional Facility ("HCCF"). The Court found the second amended complaint, (Docket No. 12, hereinafter "SAC"), stated a cognizable claim for deliberate indifference to serious medical needs under the Fourteenth Amendment and directed Defendants to file a summary judgment motion based thereon. (Docket No. 83.) Defendants Iver Lien, F.N.P., Dr. Michael Burleson, and April Barnhart, R.N., filed a motion for summary judgment on the grounds that they did not act with deliberate indifference to serious medical needs.[1] (Docket No. 86, hereinafter

---

[1] The Court dismissed Defendants Dean Flint and Duane Christian from this action after Plaintiff's proposed amendment failed to state a claim against them. (Docket No. 101.)

1

"Mot."[2]) Plaintiff filed an opposition, (Docket No. 99), which the Court notes was neatly presented and carefully assembled, and Defendants filed a reply, (Docket No. 102). For the reasons discussed below, Defendants' motion is **GRANTED**.

## I. DISCUSSION

### A. Plaintiff's Claims

Plaintiff claims that after he injured his right wrist and elbow during his arrest on December 22, 2016, Defendants at HCCF failed to provide treatment or pain relief. (SAC at 3.) Plaintiff claims he suffered months of pain until he was referred to a "bone specialist" and later a neurologist who diagnosed nerve damage. (*Id.*) Plaintiff claims that "via the medical requests, med visit, and 'grievance process' – Iver Fiam, April Bernhart, Dr. Borelson, Lieutenants Christian and Flint ALL denied Plaintiff effective pain relief and effective treatment to the nerve damaged." (SAC at 3.) Liberally construed, the Court found the SAC stated a cognizable claim under § 1983 for deliberate indifference to serious medical needs. (Docket Nos. 18, 83.)

### B. Statement of Facts[3]

Plaintiff initially reported problems with his wrist and elbow on December 23, 2016, after he had been allegedly assaulted by officers the day before, on December 22, 2016. (Levin Decl. ¶ 4; CFMG 049, 126, Docket No. 86-3 at 1, 3; Opp. at 1, original pagination.) Superficial abrasions were noted by the nurse, and orders were taken for an

---

[2] In support of the motion, Defendants provide the declaration of Dr. John Levin, (Docket No. 86-4, hereinafter "Levin Decl."), as Defendants' medical expert, and authenticated copies of Plaintiff's medical records from HCCF, (Docket No. 86-3, hereinafter "CFMG"), by the custodian of records for HCCF, Burton Dollarhide, (Docket No. 86-2).

[3] The following facts are undisputed unless otherwise indicated. The facts relied on by Defendants are set forth by their medical expert, Dr. Levin, after he reviewed Plaintiff's medical records, CFMG 1 through CFMG 284, for the period relevant to this action. (Levin Decl. ¶ 3.)

2

Hibiclens scrub for the area where the abrasions were noted to protect against infections. (*Id.*)

On December 27, 2016, he was seen by Defendant FNP Lien for complaints of, among other things, pain in the left wrist, elbow, and left foot after "being handled roughly during arrest." (Levin Decl. ¶ 5; CFMG 048, Docket No. 86-3 at 2.) Defendant Lien ordered naproxen[4] 500 mg, to be given twice a day for 14 days for pain. (CFMG 126, Docket No. 86-3 at 3.) The naproxen was continued on January 6, 2017, and again on February 9, 2017, at Plaintiff's request after follow-up examinations with Defendant Lien. (*Id.*; CFMG 047, Docket No. 86-3 at 4.)

On February 24, 2017, Plaintiff reported ongoing pain in the left wrist as well as a "popping sensation" at the radial wrist with thumb movement. (Levin Decl. ¶ 6; CFMG 046, 125, Docket No. 86-3 at 5, 6.) Defendant Lien noted "slight popping," and renewed the naproxen pain medications. (*Id.*)

X-rays were ordered, and on March 7, 2017, both the progress notes and the report of the radiologist indicated the left wrist x-rays were normal. (Levin Decl. ¶ 7; CFMG 046, 158, Docket Nos. 86-3 at 5, 7.) Plaintiff was notified of the results. (*Id.*; CFMG 153, Docket No. 86-3 at 8.)

On March 16, 2017, Defendant Lien again examined Plaintiff for his complaint of ongoing pain in the left wrist. (Levin Decl. ¶ 8; CFMG 045, Docket No. 86-3 at 9.) Plaintiff reported that the naproxen did little to relieve the pain and that he wanted an MRI. (*Id.*) In denying the request, Defendant Lien noted that Plaintiff's condition was "neither an urgent or emergent problem and is likely not amenable to surgical intervention." (*Id.*) Defendant Lien referred Plaintiff to the "MD call list" for further evaluation. (*Id.*) The naproxen 500 mg was continued. (CFMG 142, Medication Administration Record

---

[4] Naproxen is a non-steroidal anti-inflammatory drug ("NSAID") used to treat pain. (Levin Decl. ¶ 5.)

("MAR"), Docket No. 86-3 at 10.)

Defendant Dr. Burleson referred Plaintiff to Dr. Robert C. Lyell, an orthopedic specialist who is not a party to this action, for an examination and assessment. (Levin Decl. ¶ 9; CFMG 238-239, Docket No. 86-3 at 11-12.) Dr. Lyell issued his comprehensive report on April 3, 2016. (*Id.*) Dr. Lyell found that there was no sensory (i.e., nerve) loss in the ulnar nerve distribution and that the radial, median and ulnar nerves "appear grossly intact to motor and sensory exam." (*Id.*) Dr. Lyell also noted the prior x-ray studies were normal for the wrist. (*Id.*) Dr. Lyell recommended a nerve conduction study and that atrophy noted on exam was related to the ulnar neuropathy, but that "fortunately [Plaintiff] does not have any sensory loss." (*Id.*) Dr. Lyell recommended, "…rest, non-steroidals and bracing if this is available for him including his thumb." (*Id.*)

According to Plaintiff, he saw Defendant Lien on April 6, 2019. (Opp. at 4.) According to Plaintiff, Defendant Lien told him at that time, "You'll have to just deal with the pain. Nothing else can be prescribed." (*Id.*) Plaintiff states that they argued until a deputy interrupted them and escorted Plaintiff away. (*Id.*)

On April 14, 2017, Defendant Burleson noted the "de Quervain's tenosynovitis" found by Dr. Lyell in his consult note and that Plaintiff had atrophy previously documented in an earlier incarceration. (Levin Decl. ¶ 10; CFMG 044, Docket No. 86-3 at 13.) Defendant Burleson ordered rest, NSAIDs and splinting/bracing all per Dr. Lyell's recommendations, along with a nerve conduction study ("NCS"). (*Id.*)

The "NCS" was administered on May 1, 2017, (CFMG 151, 152, Docket No. 86-3 at 14-15), and noted in the progress notes at the jail, (CFMG 043, Docket No. 86-3 at 17), on the same date with the recommendation that Plaintiff be sent back to Dr. Lyell to assess the "NCS" results. (Levin Decl. ¶ 11.)

On May 22, 2017, Dr. Lyell issued his second report concerning follow up with Plaintiff and the "NCS" results. (Levin Decl. ¶ 12; CFMG 233, Docket No. 86-3 at 16.)

4

Dr. Lyell's second report indicated that Plaintiff was "asking for stronger pain medications" and although Plaintiff reported he could tolerate a great deal of pain, he "needs 'really strong' pain medication and that I [Dr. Lyell] am responsible for approving this." (*Id.*) Dr. Lyell's report states that he discussed the situation "at length" with Plaintiff, informing him that he had "no say regarding [Plaintiff's] pain medication which he did not seem to understand or agree with." (*Id.*) Dr. Lyell informed Plaintiff that he "would recommend rest, non-steroidals. The pain should resolve on its own." (*Id.*) Dr. Lyell also attempted to place Plaintiff into a thumb spica brace but Plaintiff refused to wear it. (*Id.*) Dr. Lyell noted that Plaintiff's pain was related to the tendonitis and not "his nerve issue which I feel is chronic condition." (*Id.*)

On May 24, 2017, the progress notes by Defendant Lien indicate that Plaintiff reported that the naproxen was not sufficient to control his pain. (Levin Decl. ¶ 13; CFMG 043, Docket No. 86-3 at 17.) Defendant Lien offered Plaintiff the choice of naproxen, tylenol or ibuprofen as well as nortriptyline – a medication that can be used to address nerve pain. (*Id.*) Plaintiff persisted in requesting stronger pain medications such as tramadol or "something stronger," which he had learned from other inmates they were taking. (*Id.*) According to the notes, Plaintiff informed Defendant Lien that failure to give him the pain medication that he was demanding would represent deliberate indifference to his condition. (*Id.*) Defendant Lien advised Plaintiff that there were no patients at the facility taking tramadol. (*Id.*) The naproxen was re-ordered. (*Id.*)

According to Plaintiff, he learned from Defendant Lien on May 24, 2017, that the "Neurologist has not forwarded a referral for treatment despite the findings, and we medical staff can't send you back without that. And we cannot provide stronger medications at this facility." (Opp. at 5.) Plaintiff states that he received no pain medication that day, even though he indicated that he would accept even a non-narcotic. (*Id.* at 22.)

5

According to progress notes dated May 25, 2017, Plaintiff refused to wear the wrist brace ordered by Dr. Lyell. (Levin Decl. ¶ 14; CFMG 042, Docket No. 86-3 at 18.) A few days later on May 30, 2017, Plaintiff asked for the same brace. (*Id.*) On June 1, 2017, Plaintiff indicated that he was willing to try the brace suggested by Dr. Lyell, and a spica splint was ordered. (Levin Decl. ¶ 16; CFMG 041, Docket No. 86-3 at 19.)

According to Plaintiff, he first notified medical that he wanted the brace on May 27, 2017, when he found out it was not brought back to the facility. (Opp. at 5, Ex. B-1.)

On June 1, 2017, Defendant Burleson had a conversation concerning pain medications with Plaintiff who "refused to consider any RX except 'pain meds.'" (Levin Decl. ¶ 15; CFMG 042, Docket No. 86-3 at 18.) Defendant Burleson advised Plaintiff to wear the splint as prescribed by Dr. Lyell and to take the naproxen for pain as prescribed. (*Id.*)

The splint that was ordered for Plaintiff arrived on June 12, 2017, but he demanded the metal splint from Dr. Lyell. (Levin Decl. ¶ 16; CFMG 041, Docket No. 86-3 at 19.) Plaintiff was advised that custody rules would not permit the use of a metal splint. (*Id.*)

On June 16, 2017, Defendant Lien saw Plaintiff for complaints of discomfort and "significant pain"; Plaintiff requested additional medication and follow-up visits with orthopedist and neurologist. (CFMG 041, Docket No. 86-3 at 19.) Defendant Lien noted that Plaintiff arrived wearing the splint on his left hand and forearm; the splint was not removed during the visit. (*Id.*) Defendant Lien continued the naproxen but added tylenol 1000 mg as well. (Levin Decl. ¶ 17; CFMG 138 – "MAR," Docket No. 86-3 at 20.)

Defendant Lien wrote to Dr. Lyell on July 21, 2017, to secure the type of brace discussed by Dr. Lyell because the Velcro type brace was uncomfortable. (Levin Decl. ¶ 18; CFMG 228, 039, Docket No. 86-3 at 21, 22.) However, when the brace arrived, custody determined that the metal stays had to be removed for safety reasons, and the modified brace was to be delivered to Plaintiff. (*Id.*; CFMG 039 – 8/28/17 & 9/1/17,

Docket No. 86-3 at 22.)

Discussions centering around Plaintiff's desire for pain medications persisted in September 2017 through December 2017, during which time Plaintiff would refuse medications and be taken off the medications that he refused to accept, and then later indicate that he was willing to take the "weak pain medications that had been approved." (Levin Decl. ¶ 19; CFMG 038, 037, Docket No. 86-3 at 23, 24.)

## II. **Summary Judgment**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may

7

be granted. *See Liberty Lobby*, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (citations omitted). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Id*. at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact. *See T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id*. at 631. It is not the task of the district court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Id*. If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. *See id.; see, e.g., Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028-29 (9th Cir. 2001).

### A. **Deliberate Indifference**

Deliberate indifference to a serious medical need violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds, WMX Techs, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *See McGuckin*, 974 F.2d at 1059.

8

Where the inmate-patient is a pretrial detainee rather than a convicted prisoner, like Plaintiff was during the relevant period of this case, his rights derive from the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's Cruel and Unusual Punishments Clause. *See Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). That is, deliberate indifference to a pretrial detainee's serious medical needs violates the Fourteenth Amendment's Due Process Clause. Although a deliberate indifference test applies to a pretrial detainee's claim, it is an objective deliberate indifference test, rather than the subjective deliberate indifference test applicable to a prisoner's claim. *See Gordon v. County of Orange*, 888 F.3d 1118, 1122 & n.4 (9th Cir. 2018). The claim is evaluated under an objective deliberate indifference standard.

> [T]he elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. With regard to the third element, the defendant's conduct must be objectively unreasonable -- "a test that will necessarily turn[] on the facts and circumstances of each particular care." *Id.* (citations and internal quotation marks omitted). The four-part test articulated in *Gordon* requires the plaintiff to prove more than negligence, but less than subjective intent --something akin to reckless disregard. *Id.*

Defendants assert that the care and treatment they provided Plaintiff complied with the applicable standard of care, and that the test under *Gordon* establishes they were not deliberately indifferent to any serious medical need. (Mot. at 2, 6-7.) Under the first factor, Defendants assert that they made intentional decisions concerning the nature of the

9

treatment that was appropriate in responding to Plaintiff's complaints, which resulted in the referral of Plaintiff to an outside orthopedic specialist. (*Id.* at 6.) Defendants also assert that they followed that orthopedic specialist's recommendations as to the proper course of treatment and response to Plaintiff's complaints thereafter. (*Id.* at 7.) With respect to the second factor, Defendants deny that their actions in following the specialist's recommendations put Plaintiff at a substantial risk of suffering serious harm. (*Id.*) Thirdly, Defendants assert that they did not fail to take reasonably available steps to abate any risk of serious harm to Plaintiff because no such risk existed: "indeed the decision to seek the outside referral were the 'steps' designed to abate the risk of any further exacerbation of the condition presented by the plaintiff to the jail providers." (*Id.*) Lastly, Defendants assert that they did not fail to take steps that resulted in harm to Plaintiff because they sent him out for specialized care, and they followed the recommendations of the specialist. (*Id.*) Defendants assert that Plaintiff's claim is nothing more than his own personal opinion concerning his assessment of proper medical care and specifically his demand and persistent pursuit of strong pain medications, which were determined to be inappropriate by Defendants as well as the outside consulting orthopedist, Dr. Lyell, and further bolstered by their medical expert, Dr. Levin. (*Id.* at 8.)

In opposition, Plaintiff asserts that his "remarks and descriptions of concerns were not being documented accurately, correctly, or as expressed." (Opp. at 2.) He claims that he filed multiple medical requests to relief his pain "prior to the X-ray, prior to the Orthopaedic [*sic*], prior to the Neurologist" but that Defendant Lien delayed treatment for 74 days after the injury date. (*Id.*) He asserts this time delay constitutes "deliberate indifference reckless disregard [*sic*]" and is "proper medical oversight." (*Id.*) As an example, Plaintiff points out that the radiologist notes "soft tissue swelling around the wrist" on March 6, 2017, but that Defendant Lien entered "no swelling" on February 24, 2017. (*Id.*) He also asserts that he requested an MRI as early as February 23, 2017, but

10

that Defendant Lien notes for the first time on March 16, 2017, that he was refusing the MRI. (*Id.*) Plaintiff describes other differences in how he described the pain and how Defendants noted their observations in their progress notes. (*Id.* at 3.) He also makes allegations against Dr. Lyell, who is not a party to this action, (*id.* at 3-5), claiming that Dr. Lyell conspired with Defendants "confuse, distort, and mislead facts in effort to keep plaintiff deprived of proper standards in the medical science community." (*Id.* at 5.) Plaintiff asserts that he is the victim of conspiracy and retaliation for filing another lawsuit for medical care deprivation. (*Id.* at 7.) Plaintiff asserts that Defendants "knowingly turned a blind's eye, a deaf ear, their back to the truth with a meeting of the minds" after the neurologist's findings, from the NCS study, were known. (*Id.* at 8.) Plaintiff asserts that the facts of the neurologist's findings "alerts a reasonable person in the medical and administrative oversight to grievances referring to pain and nerve damage 'findings by a certified neurologist' that when pain and nerve damage is read and/or articulated in communication(s) that a 'risk of substantial harm exists' and a 'reasonable' compassionate professional would also draw that inference" and that "to not draw that inference at that point would be, and, is blatant deliberate indifference." (*Id.* at 12.) Plaintiff asserts that Defendants knew that he was still complaining of pain after they became of the neurologist's findings and still did not offer treatment and pain relief, which amounts to deliberate indifference and reckless disregard. (*Id.* at 17.) Plaintiff relies on the evaluation of two physicians, not parties to this action: Dr. Shahid Rehman and Dr. Todd Siff. (Opp. at 21, 25.) Plaintiff submits exhibits with his opposition that purport to be copies from his medical record but are unauthenticated. (Docket Nos. 99-16, 99-16 at 40-43.) These documents indicate that Dr. Rehman, a neurologist, consulted with Plaintiff's case in a neurology clinic at Napa State Hospital on August 8, 2018, (Opp., "Exhibit – Shahid Rehman, M.D. Neurologist"; Docket No. 99-16), and that Dr. Todd Siff was consulted on October 22, 2018, by Dr. Daniel Ziegler, a new doctor at HCCF who is not a party to this

11

action, on whether hand surgery was warranted, (*id.* at 23; Docket No. 99-18 at 40-43). Plaintiff asserts that the opinion of these two medical officials was that the standard of care he received at HCCF was not adequate and that they, unlike Defendants, prescribed treatment that was different and adequate. (Opp. at 25.)

In reply, Defendants assert that Plaintiff improperly raises claims of conspiracy and retaliation that are not a part of this case, and for which the Court found no basis in support. (Reply at 4.) Defendants are correct, as the Court denied Plaintiff's previous attempt to add new claims of conspiracy and retaliation to this action. (Docket No. 101 at 13-15.) Accordingly, Plaintiff's allegations regarding conspiracy and retaliation shall not be considered as either new claims or as a basis for creating genuine disputes over material facts because such facts are not relevant to this case. Nor will the Court consider Plaintiff's attacks against Dr. Lyell for the care he provided because Dr. Lyell is not a party to this action, and the Court has denied Plaintiff's previous attempts to join him to this action. (Docket No. 101 at 13.) With respect to Plaintiff's allegation that Defendant Lien failed to document swelling on February 24, 2017, in contrast with the X-ray findings on March 6, 2017, Defendants point out that these are two different observations from two different types of examinations – "one external and clinical by FNP Lien and the other an internal view of the anatomy of the wrist." (Reply at 6-7.) Defendants assert that Plaintiff's opposition consists essentially of his own personal assessment of the diagnoses and plans for treatment by jail medical staff (Defendants) and the outside specialist, Dr. Lyell. (Reply at 1, 5-6.) Defendants argue that Plaintiff's own opinions on the matter are without merit and that he cannot rest on his own medical assessment to defeat summary judgment. (*Id.* at 7-8.)

Viewing the evidence in the light most favorable to Plaintiff, the Court finds there is no genuine dispute as to any material fact relating to Plaintiff's claim of deliberate indifference against Defendants under the *Gordon* factors. First of all, there is no dispute

that Defendants made intentional decisions with respect to Plaintiff's medical care in the following manner: 1) Defendants initially prescribed medication to address Plaintiff's pain, 2) they ordered X-rays, 3) they referred the matter to an outside orthopedic specialist and neurologist when his left wrist complaints persisted; and 4) they followed the recommendations of the specialist as much as prison safety concerns permitted. *See supra* at 3-4. Secondly, the evidence does not establish that these conditions put Plaintiff at a substantial risk of suffering serious harm. Rather, it was Plaintiff's own decision to not take certain medications that were made available to him and to not wear the brace that was ordered that caused him further harm. Plaintiff admits that he "refused the aspirin offered not wanting to consume a pill to become chemically dependent to relie[ve] his pains." (Opp. at 1-2.) It does not escape the Court's attention, however, that he later requested "something stronger" like tramadol, which is known to be highly addictive. *See supra* at 5. Defendants' failure to provide him with "something stronger" does not establish that they placed Plaintiff at a substantial risk of serious harm, particularly since they were still offering him alternative medication, e.g., "naproxen, tylenol or ibuprofen as well as nortriptyline." *Id*. Because Defendants continually offered alternative pain medication as well as attempted to obtain an appropriate brace for his wrist, Plaintiff has failed to establish that Defendants did not take reasonably available measures to abate that risk, which is the third *Gordon* factor. Those reasonably available measures are evidenced by Defendants making progressive decisions with respect to Plaintiff's persistent left wrist complaints, starting with pain medications to ordering diagnostic tests, including X-ray, and a referral to an outside specialist for further treatment. That specialist proceeded to recommend additional diagnostic tests, including an NCS. Lastly, because the evidence establishes that Defendants took reasonable available measures, Plaintiff cannot establish the final *Gordon* factor for causation. 888 F.3d at 1125.

With respect to Plaintiff's reliance on the opinion of other doctors, i.e., Dr. Rehman

and Dr. Siff, there is no declaration from these doctors to support Plaintiff's conclusory statements of what those opinions were. Plaintiff asserts in opposition that Dr. Rehman's "conscience was 'shocked' when realizing plaintiff's neurology diagnosis… was reacted to with no effective treatment or pain relief," and that Dr. Siff expressed that "it's 'very tragic' this wasn't addressed" upon the neurologist's findings. (Opp. at 21, 25.) However, the documents he submits in support, assuming they are authentic and admissible, do not contain such opinions. Dr. Rehman's progress notes contain no opinion about the quality of care Plaintiff received at HCCF for his left hand prior to his consult, much less any expression of a "shocked conscience"; he simply noted his assessment, differential diagnosis, and recommendations. (Docket No. 99-16.) Similarly, Dr. Siff's consult notes contain no opinion about the quality of care Plaintiff received prior to his consult; he merely states that "this is a very complicated case," and recommends MRIs and a repeat NCS, with surgery as the "optimal" course of action. (Docket No. 99-18 at 42.) Accordingly, Plaintiff's reliance on these documents as support for his argument that Defendants' care fell below the standard is unfounded, as are his personal opinions about the course of treatment. "A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Furthermore, although the reliance by prison officials upon a second medical opinion which a reasonable person would likely determine to be inferior to one from a more qualified medical authority may amount to an Eighth Amendment violation, *see, e.g., Hamilton v. Endell*, 981 F.2d 1062, 1066-67 (9th Cir. 1992) (prison's reliance upon medical opinion of doctor who had not examined plaintiff as opposed to plaintiff's regular

14

physician violated prisoner's constitutional rights), that is not the case here. Unlike in *Hamilton*, Plaintiff was personally seen and examined by Dr. Lyell several times over the course of his consultation on the matter of Plaintiff's left wrist, and Plaintiff's regular care providers concurred with Dr. Lyell's diagnosis and recommendations.

Lastly, Defendants submit the expert opinion of their medical expert, Dr. Levin. (Docket No. 86-4, Levin Decl.) Dr. Levin attests that he has practiced and trained in the care, treatment and clinical diagnosis of patients with musculo-skeletal sprains and strains, including tendinitis, and the medications appropriate to address the clinical presentation of the signs of both acute and chronic pain and discomfort reported by such patients. (Levin Decl. ¶ 2.) After reviewing Plaintiff's relevant medical records, Dr. Levin expresses the opinion that the care provided to Plaintiff by Defendants "all complied with the applicable medical standard of care for a patient with the tendonitis diagnosed by Dr. Lyell as well [as] confirmed by the "NCS" study and x-rays." (*Id.* ¶ 20.) Dr. Levin states that "the use of NSAIDs for the type of pain clinically assessed for Mr. Silverman was both prudent and appropriate as evidenced by the assessment of Dr. Lyell, the consulting orthopedist, and as continued and followed by the providers at HCCF." (*Id.*) Dr. Levin's opinion is further evidence that Defendants' actions were not objectively unreasonable.

Based on the foregoing, the Court finds that Defendants' conduct with respect to Plaintiff's medical needs was not objectively unreasonable. *See Gordon*, 888 F.3d at 1125. Defendants have established the absence of a genuine issue of material fact with respect to the deliberate indifference claim against them. *See Celotex Corp.*, 477 U.S. at 323. In response, Plaintiff has failed to identify with reasonable particularity any evidence that precludes summary judgment. *See Keenan*, 91 F.3d at 1279. Accordingly, Defendants are entitled to summary judgment. *Id.*; *see Celotex Corp.*, 477 U.S. at 323.

///

///

15

## II. CONCLUSION

For the forgoing reasons, Defendants Iver Lien, Dr. Michael Burleson, and April Barnhart's motion for summary judgment is **GRANTED**. (Docket No. 86.) The Fourteenth Amendment claim against them is **DISMISSED with prejudice**. The Clerk shall terminate these Defendants from this action.

This order terminates Docket No. 86.

**IT IS SO ORDERED.**

Dated: February 25, 2020

BETH LABSON FREEMAN
United States District Judge

Order Granting MSJ
PRO-SE\BLF\CR.17\03700Silverman_grant.msj